

Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 4550 | **DATE** | 9/29/2003 |
| **CASE TITLE** | Cassady vs. Quaker Oats Co. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Cross-Motions for Summary Judgment

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]   For the reasons set forth in the attached opinion, Defendants' Motion for Summary Judgment [Doc. 12] is granted and Plaintiff's Motion for Summary Judgment [Doc. 15] is denied. This case is closed.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | SEP 3 0 2003 date docketed | |
| | Notified counsel by telephone. | | | |
| ✓ | Docketing to mail notices. | | docketing deputy initials | 19 |
| ✓ | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | | |
| jar/lc | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice / mailing deputy initials | |

DOCKETED
SEP 3 0 2003

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GARY CASSADY, et al., | ) |
| Plaintiffs, | ) No. 02 C 4550 |
| v. | ) HONORABLE DAVID H. COAR |
| THE QUAKER OATS CO., et al. | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiffs in this case challenge Defendants' decision to deny them supplemental early retirement benefits under a pension plan governed by the Employee Retirement Income Security Act (ERISA). Both parties have moved for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The motions are fully briefed and ripe for decision. For the reasons set forth below, the Court grants Defendants' Motion for Summary Judgment and denies Plaintiff's Motion for Summary Judgment.

I. FACTS[1]

A. Background

Plaintiffs are formerly hourly employees at the Gaines Pet Food Plant in Kankakee, Illinois. Defendant The Quaker Oats Company ("Quaker") is a New Jersey Corporation with offices in Chicago, Illinois. Plaintiffs were participants in the Gaines Foods, Inc. Kankakee Hourly Employees' Retirement Plan ("Gaines Plan"). The Gaines Plan was first established in

---

[1]Unless otherwise noted, the findings of fact are supported in the parties' Joint Statement of Undisputed Facts, filed with their motions for summary judgment.

1

19

June 1984. The majority of the assets of the Gaines Plan were derived solely from participant contributions.

The Gaines Plan provided a supplemental early retirement benefit in Section 8(c) to any "Employee who was in Recognized Service on or after his 55th birthday and has completed 10 or more years of Recognized Service . . ." (Jnt. Appendix, Ex. 2, at 27) The Gaines Plan also provided an alternative route for supplemental early retirement eligibility in Section 13(c)(3) of the plan. Section 13(c)(3) of the Gaines Plan provides that an employee with ten years of recognized service who was terminated by reason of plant closing or lay-off could elect to receive the supplemental early retirement benefit "commencing at age 55 if the employee has not sooner returned to service." (Jnt. Appendix, Ex. 2, Third Amend, at 17). Under Section 13(c)(3), then, any employee who had ten years of service with the company who was terminated because of a plant closing or a lay-off and did not return to work with the company would be eligible to receive supplemental early retirement benefits when she reached the age of 55.

In August 1986, Quaker purchased Gaines Food, Inc. and became Gaines' parent company. Quaker maintained the Gaines Plan until December 31, 1994, at which time the Gaines Plan was merged into the Quaker Retirement Plan ("Quaker Plan"). Prior to December 31, 1994, Plaintiffs were active participants in the Gaines Plan as defined in Section 3(7) of ERISA, 29 U.S.C. § 1002(7). From December 31, 1994 through March 15, 1995, Plaintiffs were active participants in the Quaker Plan. After the Gaines Plan was merged into the Quaker Plan, Quaker explicitly assured its participants that they would be entitled to receive "an amount equal to his vested accrued benefit [from the Gaines Plan] . . . as in effect immediately prior to its merger into the Quaker Plan." (Jnt. Appendix, Ex. 3, at 1)

2

On March 15, 1995, Quaker sold its Gaines subsidiary and the Kankakee plant to the H.J. Heinz Company. Before the sale, Quaker informed the Plaintiffs verbally and in writing that they would become automatically vested in accrued pension benefits and would not lose any such benefits because of the sale. On July 17, 1995, Quaker notified its former employees in writing of the accrued benefits that they were eligible to receive under the Quaker plan. The supplemental early retirement benefit was not included among those benefits listed.

**B.    The First Application for Supplemental Early Retirement Benefits**

On January 8, 1996, the Plaintiffs applied in writing for benefits related to Quaker's sale of the Kankakee facility to Heinz. (Jnt. Appendix, Ex. 8) Plaintiffs contended that they were permanently terminated when Quaker sold the Kankakee facility to Heinz and were consequently entitled to severance benefits and supplemental early retirement benefits. On April 18, 1996, the application for benefits was denied. (Jnt. Appendix, Ex. 9) On June 18, 1996, Quaker sent a letter to Plaintiffs' attorneys describing the appeal procedures for denied benefit claims. (Jnt. Appendix, Ex. 10) On September 3, 1996, Plaintiffs attorneys sent a lengthy letter appealing the decision to deny them the supplemental early retirement benefit. The Quaker Administrative Committee denied Plaintiffs appeal on January 6, 1997. (Jnt. Appendix, Ex. 1) The Committee reasoned that the sale of the Kankakee facility was neither a plant closing nor a layoff within the meaning of Section 13(c)(3) of the Gaines Plan, therefore the Plaintiffs were not eligible for supplemental early retirement benefits.

On September 24, 1997, Plaintiffs filed a multiple count complaint seeking to challenge Quaker's decision to deny their claim for supplemental early retirement benefits under Section 13(c)(3) of the Plan. The complaint filed in 1997 was styled Schultz, et al. v. Quaker Oats Co.,

et al., No. 97-C-6735. This Court shall refer to this as the "<u>Schultz</u> litigation." In the <u>Schultz</u> litigation, Plaintiffs continued to assert their position that the sale of the Kankakee facility to Heinz effectuated either a plant closing or a layoff that would trigger supplemental early retirement benefits under Section 13(c)(3).

On January 23, 1998, Plaintiffs filed their first amended complaint in <u>Schultz</u>. On August 3, 1998, the district court, per Judge Plunkett, dismissed Plaintiffs' claims for supplemental early retirement benefits under Section 13(c)(3). The court there found that Defendants' position that the sale of the Kankakee facility did not constitute a plant closing or a lay-off was "clearly reasonable." (Jnt. Appendix, Ex. 6, at 9) The Plaintiffs presented a number of additional theories of recovery to the district court in the <u>Schultz</u> litigation (those theories included, among others, partial termination, breach of fiduciary duty, interference with protected rights, violation of non-forfeiture provisions, and promissory estoppel), but they were all dismissed for failure to exhaust administrative remedies. (Jnt. Appendix, Ex. 7, at 12)

After the <u>Schultz</u> litigation reached its conclusion in the district court, the Plaintiffs filed a notice of appeal to the Seventh Circuit on March 10, 1999. On October 27, 1999, the Seventh Circuit dismissed the appeal pursuant to the Plaintiff-Appellants' motion to voluntarily dismiss the appeal.

In July 1997, prior to the filing of the <u>Schultz</u> litigation, Heinz closed the Kankakee plant and laid off all the plaintiffs. At no time in the <u>Schultz</u> litigation did Plaintiffs present to the court their current theory that when Heinz closed the Kankakee plant in July 1997 they became eligible for supplemental early retirement benefits under Section 13(c)(3) of the Gaines Plan.

In a letter dated December 13, 2000, Plaintiffs appealed the denial of the early retirement

supplement to the Quaker Administrative Committee. The letter purported to accord with "the mandate of the United States Court of Appeals for the Seventh Circuit and the decision of the United States District Court." (Jnt. Appendix, Ex. 15, at 1) In the appeal letter, the plaintiffs presented seven theories as to why their claim for supplemental early retirement benefits under Section 13(c)(3) should have been approved. One of those theories was "the Plant Closing and Layoff." (Id. at 4–5). There, for the first time, the Plaintiffs referenced the 1997 closing of the Gaines facility in Kankakee. Plaintiffs contended that "each employee with a least 10 years of service as of one year from the date of the lay-off and closing of the Gaines facility is vested in the early retirement supplement." (Id. at 5)

Defendants issued a final decision on Plaintiffs December 2000 appeal on May 1, 2001. In that decision, the Plan's Administrative Committee reached several conclusions. First, it concluded that the appeal was not timely "and must be rejected on this basis alone." (Jnt. Appendix, Ex. 14, at 3) Under the Quaker plan's denial and review procedures, appeals must be brought within sixty days after a claim is denied. The Committee proceeded to address the merits of the appeal. In the section of the committee's decision addressing the plant closing and layoff theory, the committee does not address the effect, if any, of the closing of the Kankakee facility in 1997 on the eligibility for supplemental early retirement benefits under Section 13(c)(3). Instead, it addresses itself to the original theory advanced in the Schultz litigation that the sale of the Kankakee facility from Quaker to Heinz was itself a plant closing or lay-off. Not surprisingly, the committee once again found that the sale did not trigger the supplemental early retirement benefits, only this time it was able to rely on the factual and legal conclusions of the district court in Schultz in support of its conclusion.

5

## C. Procedural History of the Current Litigation

On June 26, 2002, Plaintiffs filed a two-count complaint in this court under ERISA. Count I of the complaint alleges that the denial of supplemental early retirement benefits was improper because the Plaintiffs were terminated by reason of a lay-off in July 1997 when the Kankakee facility closed. Count II of the complaint alleges that the denial of supplemental early retirement benefits was improper because the Plaintiffs were terminated by reason of a plant closing in July 1997.

Defendants filed a Motion to Dismiss for failure to state a claim on August 7, 2002. The Motion to Dismiss was denied on November 13, 2002. Both parties subsequently moved for summary judgment.

## II. DISCUSSION

### A. Legal Standard

Summary Judgment shall be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). "When the material facts are not in dispute, the sole question is whether the moving party is entitled to judgment as a matter of law." Cozzie v. Metropolitan Life Ins. Co., 140 F.3d 1104, 1107 (7th Cir. 1998) (quoting Santaella v. Metropolitan Life Ins. Co., 123 F.3d 456, 461 (7th Cir. 1997)) (internal quotation marks omitted).

In ERISA cases, there is an additional question relating to the standard of review to be applied to decisions of ERISA plan administrators. The decision of ERISA plan administrators to grant or deny benefits is subject either to de novo review or to review under an arbitrary and

capricious standard, depending on the terms of the ERISA plan. "[A] denial of benefits . . . is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine benefits or construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). In this case, the relevant plan has already been judicially determined to confer sufficient discretion upon the administrators to trigger the arbitrary and capricious standard of review. See Schultz v. Quaker Oat Co., No. 97-C-6735, at 7 (slip op.) (attached to Jnt Appendix as Ex. 5). Consequently, this Court will apply the arbitrary and capricious standard to the administrators decision in this case. Under the arbitrary and capricious standard of review, the question is whether the Administrative Committee's decision to deny benefits was reasonable.

**B.     Analysis**

The parties have presented various issues in support of their motions for summary judgment. Defendants contend that they are entitled to summary judgment for several reasons. First, they contend that Plaintiffs' claims are foreclosed because they were not employees of Quaker at the time the Kankakee facility was closed. Second, they contend that res judicata bars Plaintiffs' claims. Third, they assert that Plaintiffs failed to exhaust their internal plan remedies. Finally, Defendants assert that the Administrative Committee's decision that the claim was untimely is not arbitrary and capricious. Plaintiffs principle contention is that Quaker's denial of their claim for supplemental early retirement benefits was wrong, arbitrary and capricious.

The Court will begin by addressing res judicata. It will then proceed to address the Administrative Committee's decision and the arguments relating to exhaustion. Because the two positions are substantially related, the Court will treat them together.

## 1. The Suit is not Precluded by Res Judicata

Defendants claim that Plaintiff's current complaint should be barred by the doctrine of res judicata. Res judicata, also known as claim preclusion, prohibits parties from relitigating issues that were litigated or could have been litigated in an earlier lawsuit. The doctrine seeks to preserve judicial resources and protect the finality interests of litigants. To apply the doctrine of res judicata, three elements must be present: (1) judgment on the merits in an earlier action; (2) identity of parties in the two suits; and (3) identity of the cause of action in both suits.

Here, there is no dispute that there was both a judgment on the merits in an earlier action between identical parties. The Schultz litigation involved the same plaintiffs and the same defendants. The only question about res judicata is whether the cause of action in both suits is identical. Claims are identical for res judicata purposes if they arise "from the same incident, events, transaction, circumstances, or other factual nebula as a prior suit that had gone to final judgment." Okoro v. Bohman, 164 F.3d 1059, 1062 (7th Cir. 1999). This test "does not require an identity of legal theory or of facts." Id. If two (or more) claims arise from "the same core of operative facts," Brzostowski, 49 F.3d 337, 339 (7th Cir. 1995), a party is required to litigate those claims together or risk preclusion under the doctrine of res judicata.

In this case, though the legal claim is identical, the plaintiffs contend that the defendants wrongfully denied them supplemental early retirement benefits, the core of operative facts is different in this litigation than the Schultz litigation. In Schultz, Plaintiffs were asserting an entitlement to supplemental early retirement benefits arising from Quaker's sale of the Gaines facility to Heinz in March 1995. In this case, Plaintiffs are asserting an entitlement to supplemental early retirement benefits arising from Heinz' subsequent closing of the Gaines

8

facility in Kankakee in July 1997. The core of operative facts for the two claims is therefore sufficiently distinct to avoid preclusion under res judicata.

Defendants contend that Plaintiffs ought have been required to present the current claim to the district court in Schultz because Heinz closed the Gaines facility in Kankakee before the Schultz litigation was filed. At the time, Plaintiffs had not presented their claim to supplemental early retirement benefits based on the actual plant closing to Quaker for review. Consequently, it would have been dismissed for failure to exhaust internal plan remedies. A dismissal for want of exhaustion will not preclude a subsequent suit on the merits of the denial. See Smith v. Blue Cross & Blue Shield United of Wisc., 959 F.2d 655, 658 (7th Cir. 1992) ("Judgment on this theory [failure to exhaust] will not prevent plaintiffs from exhausting their plan remedy, assuming they are not barred by lapse of time, and then suing upon the merits.").

### 2. Exhaustion and the Administrative Committee decision

In ERISA cases, a party must exhaust internal plan remedies as to each claim before bringing suit in federal court. See Zhou v. Guardian Life Ins. Co., 295 F.3d 677, 679 (7th Cir. 2002) ("As a pre-requisite to filing suit, an ERISA plaintiff must exhaust his internal administrative remedies.") (citing Doe v. Blue Cross & Blue Shield United of Wisc., 112 F.3d 869, 873 (7th Cir. 1997)). The only circumstance where exhaustion is excused is where further administrative appeal is futile. Id. at 680.

Plaintiffs do not contend that further administrative appeal would be futile. Rather, they contend that they did present and exhaust their claim in the December 2000 appeal letter. The December 2000 appeal letter did, for the first time, present the plant closing to the Administrative Committee. The presence of this new factual contestation in the December 2000

9

appeal letter, though, was at least procedurally bizarre. The December 2000 letter begins with a statement that it is an appeal filed pursuant to the mandate of the district court in Schultz and the Seventh Circuit. As noted above, the Plaintiffs did not present the plant closing in 1997 to the district court in Schultz (which was proper as the claim was unexhausted), so it was incongruous (if not disingenuous) for Plaintiffs to suggest that the initial claim for benefits related to the 1997 plant closing was in any way related to the Schultz litigation. Additionally, the claim was not well-developed in the Plaintiffs' December 2000 letter. Although it was in the letter, it was presented in a somewhat perfunctory manner. Nevertheless, the claim was presented to the Administrative Committee.

In response, the Administrative Committee did not address the claim. In the portion of its determination corresponding to Plaintiffs' plant closing and lay-off claim, the Committee solely addressed the previous claim from the Schultz litigation that Quaker's sale of Gaines did not constitute a plant closing or a lay-off. As to that issue, the Committee correctly found that both parties are bound by the Court's determination in Schultz.

It is unclear exactly why the Administrative Committee did not address the new claim relating to the 1997 plant closing. Plaintiffs would like for the Court to leap from the lack of a determination to a de novo review of the Plan and its requirements under the theory that the Administrative Committee lost its one chance to make a determination on the issue. The Court is not inclined to make that logical leap. This Court is disinclined to undertake de novo review of ERISA plan administrators decisions when the administrators are ordinarily entitled to review under the more deferential arbitrary and capricious standard. Plaintiffs' suggestion, if accepted, would undermine the statutory structure.

The plan in this case affords the plan administrators the discretion to make benefit determinations and construe the plan documents. The plan also affords the Plaintiffs a right to an appeal of any adverse determination to the Plan Administrative Committee. The first round of internal appeals before the <u>Schultz</u> litigation gives this Court confidence that the Plaintiffs are capable of mounting a thorough appeal to the denial of benefits and that Defendants are capable of addressing the appeal on the merits. This is the structure that the plan sets up for adverse benefit determinations, and it is the process that ERISA requires potential plaintiffs to undertake prior to filing suit. Consequently, the Defendants' Motion for Summary Judgment will be granted due to Plaintiffs failure to exhaust their internal plan remedies.

Having determined that the Defendants' Motion for Summary Judgment must be granted on the issue of failure to exhaust internal plan remedies, there is only one remaining issue that the Court must address: timeliness of the appeal. In denying the claims presented in Plaintiffs' December 2000 appeal letter, the Plan Administrators determined, among other things, that the appeal was untimely. It is possible that the Administrators may seek to rely on that finding if and when the Plaintiffs decide to pursue their internal plan remedies. As the Court reads the December 2000 "appeal" letter, all of the issues contained therein were being presented to the Administrative Committee for the first time. According to the plan, participants have the right to appeal any adverse benefit determination within sixty days of the determination. If the Defendants' practice prior to the <u>Schultz</u> litigation is any guide, the sixty-day period may even be extended at Defendants' discretion.[2] The Plaintiffs should probably have styled their "appeal" as

---

[2]The sixty-day period for appeal of the first adverse benefits determination would have lapsed on or around June 18, 1996. Defendants first extended it to June 26, 1996, and then to September 1996, when the Plaintiffs' appeal was accepted and processed.

11

a claim for benefits and the Committee (if it were adhering to prior practice) ought have issued its determination along with a notice of the rights to subsequent review. Not only did the Committee fail to issue such a notice, it went further and determined that these claims (which had never been previously presented) were untimely in part because the sixty-day time period for an appeal had lapsed. Plaintiffs never had an opportunity to appeal because there was previously never an adverse determination on these issues. Without an initial denial of benefits, it is impossible for any appeal to be untimely under the sixty-day reasoning Defendants provided in their determination.

In addition to holding Plaintiffs' appeal untimely under the sixty-day period, the Administrative Committee noted that "Participants delay in bringing their new claims before the Administrative Committee is undue and prejudicial." (Jnt. Appendix, Ex. 14, at 4) Nestled in that sentence is an equitable argument that Plaintiffs' claims should be barred by the doctrine of laches. Laches will bar a plaintiff when a plaintiff's delay in filing is: (1) unreasonable and inexcusable; and (2) materially prejudices a defendant. See Smith v. Caterpillar, 338 F.3d 730, 733 (7th Cir. 2003). Of course, a showing of material prejudice, not just the mere allegation of prejudice, is required before laches can properly apply. Id. at 734. As with Plaintiffs' claims relating to the plant closing in 1997, the first inquiry regarding the application of laches properly lies with the plan administrator.

In the internal plan review that may follow the dismissal of this lawsuit, the Defendant might assert the position that the May 2001 denial was an initial denial that began the sixty-day appeal clock. Such a position would be manifestly erroneous. The May 2001 denial was clearly styled a final determination that did not provide Plaintiffs with any opportunity to appeal or

notice of their appellate rights under the Plan. Additionally, with respect to the plant closing and lay-off claims (which are the only claims that Plaintiffs continue to press), there was literally no decision to appeal other than a *sub silentio* denial. In response to Plaintiffs' claim that the 1997 closing of the Gaines facility triggered their eligibility for supplemental early retirement benefits under Section 13(c)(3), Defendants may only rely on the sixty-day deadline at their own peril.[3] They may, however, consider laches. The Court expresses no view as to the applicability of laches to Plaintiffs' claims.

## CONCLUSION

For the reasons set forth above, this Court grants Defendant's Motion for Summary Judgment.

**Enter:**

David H. Coar
**United States District Judge**

**Dated:** September 29, 2003

---

[3]The Court includes this caution here only because the behavior of both sides in this case hints at disingenuousness. The Plaintiff half-heartedly included a new claim relating to the 1997 plant closing in a new document styled an "appeal" pursuant to the previous litigation, litigation which did not address the 1997 plant closing. Defendants, in response, ignored Plaintiffs new claim relating to the plant closing entirely, but went on to address the other new claims presented in the appeal on the merits. Now the Defendant seeks to apply the arbitrary and capricious standard of review to a non-decision, while the Plaintiff seeks to get around the statutory requirements for challenging a benefits determination in the district courts. While the parties are doubtless weary of a dispute that has now dragged on for nearly eight years, attempts to circumvent proper procedures are not going to accelerate the resolution of this matter.

13